Rodges REDMOND, Plaintiff-Appellee,

v.

GAF CORPORATION,
Defendant-Appellant.

No. 76–1839.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 29, 1977.

Decided April 10, 1978.

Fred F. Fielding, Washington, D. C., Robert H. Joyce, Chicago, Ill., for defendant-appellant.

William Freivogel, Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, WOOD, Circuit Judge, and ESCHBACH, Chief District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

GAF Corporation appeals from the judgment entered below that its discharge of employee, Rodges Redmond, constituted religious discrimination in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e–2(a) and 42 U.S.C. 2000e(j)).

The case was tried before the court without a jury in April of 1976 on Redmond's second amended complaint[1] which alleged the following violations of Title VII by GAF: (a) failure to promote plaintiff because of his race; (b) compensation of plaintiff at a lower rate than other employees because of his race; (c) harassment of plaintiff in retaliation for filing discrimination charges with the Equal Employment Opportunity Commission (hereinafter EEOC); and (d) termination of plaintiff either in retaliation for bringing EEOC charges or because of his inability to work overtime on Saturdays, even though his religious practices prevented him from doing so.

At the close of plaintiff's case, the court found that plaintiff had made out a *prima facie* case of religious discrimination, but

---

* The Honorable Jesse E. Eschbach, Chief District Judge of the Northern District of Indiana, is sitting by designation.

1. This suit originally began in July of 1974 when Redmond filed a *pro se* complaint, following receipt of a Notice of Right to Sue from EEOC, charging racial discrimination. Redmond filed the harassment charge with EEOC on July 10, 1974. Following his termination on August 2, 1974, he amended his EEOC complaint to include his termination and the religious discrimination charge. The EEOC issued a Notice of Right to Sue on February 24, 1975. Redmond filed his second amended complaint on February 28, 1975.

dismissed the other charges.[2] After trial on this issue, the court found that the defendant had failed to show any effort to reasonably "accommodate" plaintiff's religious practices or that an accommodation effort would have caused the defendant any "inconvenience." It concluded that GAF had violated Title VII in that "said discharge discriminated against the plaintiff in the exercise of his religion and his religious practices and activities." We agree.

The facts of the case are briefly as follows: Redmond had been employed by GAF since 1952 and had been a member of the Jehovah's Witnesses religion since 1958. Redmond was appointed to be in charge of a Bible study class by the Elders of the church in 1959.[3] This class met on Tuesday evenings until January, 1974 when it was changed by the Body of Elders to Saturday morning.[4] This change resulted, for the first time in all of the many years of Redmond's employment with GAF, in a conflict between the required overtime infrequently scheduled on Saturdays [5] and Redmond's religious practices. While the record is unclear as to exactly when GAF was informed of this conflict, it is clear that Redmond did not work Saturday overtime after January 1974. The record, however, does suggest both that overtime had been scheduled by

GAF during this period for which Redmond had been excused, and that GAF was aware of the reason for his inability to work on Saturday.[6]

Just after an incident in July of 1974, when he was suspended for one day for failure to return for annual inventory which was held in the middle of his vacation,[7] Redmond was scheduled to work overtime on Saturday. After his protest to his immediate supervisor, Hampton, proved unsuccessful, he requested a meeting for the next day with Hampton, and Svatos, the warehouse manager. Redmond testified that even though his employers were aware that he could not work on Saturday because of his "religious obligation," he was told that either he agreed to work or he would lose his job. When he told them he would not be able to work the scheduled overtime on the coming Saturday, he was terminated.

## I.

Title VII prohibits discrimination based on "religion," 42 U.S.C. § 2000e(a)(1), but until the 1972 amendment of the act did not define the term or otherwise indicate the boundaries of the beliefs being protected.

---

**2.** No appeal has been taken from the dismissal of the other charges.

**3.** Mr. Hearring, an elder and the bible study overseer of Redmond's church testified that the leader for the Bible study class is recommended by the elders of his congregation and when the appointment is approved by the Watchtower Bible and Tract Society headquarters in New York, the person holds that position for life.

**4.** Hearring also testified that the decision to change the meeting from Tuesday to Saturday was made by the Body of Elders and that it was not within the power of Redmond, or even himself, as Bible study overseer, to change the time the class met.

**5.** The record reveals that Saturday overtime for which Redmond was scheduled to work occurred five times during 1973. Overtime was often scheduled during the regular work week, requiring the employees to either come in early or stay late. Mr. Redmond has always been able to work this overtime.

**6.** Redmond testified that when he learned he was scheduled for overtime on Saturday in August, he stated to his supervisor, "I thought we had discussed this several times before, that I was not able to work on Saturday because of my religious obligation . . . ." When the supervisor testified regarding the previous conduct of Redmond, he stated, "[W]e were allowing him to go on Saturday . . . prior to this time . . . ."

**7.** The judge below made the following finding of fact concerning this incident:

[P]laintiff was suspended for one day without pay for failing to return from vacation to assist defendant in completion of an inventory. Plaintiff had previously informed the defendant that during his vacation he would be attending a religious conference in Milwaukee, Wisconsin, and that if it were possible for him to return for inventory, he would return, but if it were not possible, he would not return.

The 1972 amendment, 42 U.S.C. § 2000e(j), added the following definition: "The term 'religion' includes all aspects of religious observance and practice, as well as belief . . . ." While the words of the statute make it clear that Congress was attempting to protect both subjective belief and practices followed in carrying out such belief, the enactment does nothing to aid courts in determining the breadth of the "beliefs" and "practices" to be protected, other than to say that they must be "religious."

Most of the reported cases discussing "religious discrimination" under Title VII involve situations where either Sabbatarianism or a practice specifically mandated or prohibited by a tenet of the plaintiff's religion is involved.[8] However, despite support which can be cited for both positions,[9] we do not feel the protection of Title VII is limited to these categories.

First, we note that the very words of the statute ("*all aspects* of religious observance and practice . . . .") leave little room for such a limited interpretation. Secondly, we note that to restrict the act to those practices which are mandated or prohibited by a tenet of the religion, would involve the court in determining not only what are the tenets of · a particular religion, which by itself perhaps would not be beyond the province of the court, but would frequently require the courts to decide whether a particular practice is or is not required by the tenets of the religion.[10] We find such a judicial determination to be irreconcilable with the warning issued by the Supreme Court in *Fowler v. Rhode Island*, 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953), "[I]t is no business of courts to say . . . what is a religious practice or activity . . . ."

The Supreme Court has never had the occasion to interpret this phrase of the 1972 amendment, but the two circuits which have considered it, the Fifth and Sixth Circuits,[11] both have concluded that it is not to be given a narrow or limited interpretation. We conclude that conduct which is "religiously motivated," *i. e.,* "all forms and aspects of religion, however eccentric . . . ." is protected. *Cooper v. General*

---

**8.** See e. g., *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) (Sabbatarianism); *Jordan v. North Carolina Nat'l Bank,* 565 F.2d 72 (4th Cir. 1977) (Sabbatarianism); *Chrysler Corp. v. Mann,* 561 F.2d 1282 (8th Cir. 1977) (Sabbatarianism); *United States v. City of Albuquerque,* 545 F.2d 110 (10th Cir. 1976), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (Sabbatarianism); *Williams v. Southern Gas Co.,* 529 F.2d 483 (10th Cir. 1976) (Sabbatarianism), *cert. denied,* 429 U.S. 959, 97 S.Ct. 381, 50 L.Ed.2d 325; *Draper v. United States Pipe and Foundry Co.,* 527 F.2d 515 (6th Cir. 1975) (Sabbatarianism); *Reid v. Memphis Publishing Co.,* 521 F.2d 512 (6th Cir. 1975); *Cummins v. Parker Seal Co.,* 516 F.2d 544 (6th Cir. 1975), *aff'd by equally divided court,* 429 U.S. 65, 97 S.Ct. 342, 50 L.Ed.2d 303 (1976), *vacated and remanded on rehearing,* 433 U.S. 903, 97 S.Ct. 2965, 53 L.Ed.2d 1087 (1977) (Sabbatarianism); *Riley v. Bendix Corp.,* 464 F.2d 1113 (5th Cir. 1972) (Sabbatarianism).

**9.** Support for the Sabbatarianism limitation can be found in the title given by the EEOC in its guidelines on the subject, 29 C.F.R. § 1605.1 (1975), "Observation of Sabbath and other Religious Holidays." Similarly, the legislative history reveals that the amendment was proposed to protect Saturday Sabbatarians. 118 Cong. Rec. 705. *But see Cooper,* 533 F.2d at 166, n. 9. Note also that the dissent in *Hardison,* 432 U.S. at 87, 97 S.Ct. 2264, refers to the numerous cases involving Title VII religious discrimination as involving practices which are a "religious commandment."

**10.** See *e. g., Cooper v. General Dynamics,* D.C., 378 F.Supp. 1258 (1975), where the district court conducted extensive investigation into the tenets of plaintiff's religion, which he claimed forbid him from joining the union, and concluded it was "specious and irrational." The Fifth Circuit reversed, 533 F.2d 163 (5th Cir. 1976).

**11.** In *McDaniel v. Essex,* 571 F.2d 338 (6th Cir. 1978), the Sixth Circuit noted, "It is clear from the language of § 701(j) that it applies to all religious observances and practices and is not limited to claims of discrimination based on requirements of Sabbath work." *Id.* at 6.

The Fifth Circuit addressed the issue in *Cooper v. General Dynamics,* 533 F.2d 163 (5th Cir. 1976).

The Ninth Circuit in *Yott v. North American Rockwell Corp.,* 501 F.2d 398 (9th Cir. 1974), without specifically addressing the issue by implication also so held.

*Dynamics,* 533 F.2d 163, 168 (5th Cir. 1976).[12]

■ We are thus unable to agree with the suggestion made by GAF on appeal, that because Saturday work *per se* is not prohibited by plaintiff's religion, that the practices in question are outside the protection of Title VII. There is no dispute that Redmond was sincere in his religious belief, having been an active participating member of the church for over 16 years. The evidence establishes that he was appointed to be a lifetime leader of the Bible study class, and had done so for many years prior to this case. The evidence showed that the time of the meeting was arranged by the elders, and that following the meeting the group, of which Redmond was the leader, did field missionary work. Redmond testified that he felt his participation in the Saturday activities was at the dictate of his elders and that they were a "religious obligation." We conclude that the practices in question are within the protection offered by § 2000e(j) to "all aspects of religious observance and practice".

## II.

According to § 2000e(j) once the plaintiff here had established that his practice, which prevented him working Saturday overtime, was "religious" and that nonetheless it had been used as the basis for discharging him, the burden shifted to the employer to "demonstrate that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."

The court below found that plaintiff had made out a *prima facie* case of religious discrimination. The court further found that the defendant made "no effort to accommodate plaintiff," nor had it introduced any evidence "showing or tending to show any inconvenience" which would have prevented it from accommodating plaintiff's religious practices.

## A.

■ Implicit within plaintiff's *prima facie* case is the requirement that plaintiff inform his employer of both his religious needs and his need for an accommodation. Defendant at the time of oral argument cited certain recent cases which he states show that there is still another interim step or burden of proof which plaintiff must meet, and here failed to do, before the burden shifts under § 2000e(j) to GAF.

GAF cites *Yott v. North American Rockwell Corp.,* 428 F.Supp. 763, 769 (1977), for the proposition that under § 2000e(j) "the plaintiff has the burden of proving that he has offered to the employer an accommodation which is acceptable to him (the employee)." This would require that the plaintiff not only advise his employer of his religious needs and the nature and extent of the potential or actual conflict in terms of his employment, but would also place on the plaintiff the burden of suggesting to his employer possible methods of accommodation. While we feel plaintiff should be free, even encouraged, to suggest to his employer possible ways of accommodating his religious needs, we see nothing in the statute to support the position that this is part of plaintiff's burden of proof.

*Chrysler Corp. v. Mann,* 561 F.2d 1282 (8th Cir. 1977), also cited by defendant, states that the plaintiff also has a duty "to attempt to accommodate his beliefs himself." This duty is found not in Title VII, but rather in the "mutuality of obligation [which] inheres in the employer-employee relationship" apart from the Act. *Id.* at 1285. We agree that the concept of a "mutuality of obligation" is inherent in accommodation, for rarely will an accommodation be successful without mutual efforts and cooperation. However, to the extent that

12. We believe the proper test to be applied to the determination of what is "religious" under § 2000e(j) can be derived from the Supreme Court decisions in *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), and *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1969), i. e., (1) is the "belief" for which protection is sought "religious" in person's own scheme of things, and (2) is it "sincerely held."

the *Chrysler* court may be interpreted to say that it is incumbent on plaintiff to show first that he has made some effort to either "compromise" or accommodate his own religious beliefs before he can seek an accommodation from his employer, we disagree.[13]

In this connection, we now deal with defendant's claim that plaintiff failed to provide sufficient information to put it on notice of his religious needs and thus to permit an accommodation. The *Chrysler* court noted that an employee who is disinterested in informing his employer of his religious needs "may forego the right to have his beliefs accommodated by his employer." 561 F.2d at 1286.

We agree with defendant that accommodation is not so onerous as to charge an employer with the responsibility for continually searching for each potential religious conflict of every employee. The employee has the duty to inform his employer of his religious needs so that the employer has notice of the conflict.

The evidence indicates that plaintiff's Bible study class was switched to Saturday morning in early 1974. The record also reveals that plaintiff did not work any Saturdays after January, 1974. While there is no clear record as to exactly what the situation was between January and July of 1974, it appears that Mr. Redmond was being excused from Saturday work because of his "religious obligation."[14]

While there is a paucity of information in the record regarding this period of time, when the conflict finally reached a climax in early August, Mr. Redmond testified, without contradiction, that he told his supervisor, Hampton, "I thought we had discussed this several times before, that I was not able to work on Saturday because of my religious obligation." The following day during the meeting with Hampton and Svatos, Mr. Redmond stated, "I've talked with you and Mr. Hampton several times before about the matter of Saturday work . . ." I thought we had an understanding as to why I was not able to come to work on Saturday . . . I cannot work Saturdays . . . I have a religious obligation." When Mr. Svatos testified regarding the meeting, his account was that "Rodges, of course, advised us that he couldn't work on Saturdays because of his Bible classes." Whatever confusion or misunderstanding that may have existed prior to this time as to the reasons for Mr. Redmond's inability to work on Saturday, they were clearly eliminated during this meeting.

## B.

Next, we address the defendant's argument that this court is entitled to make *de novo* review of the trial court's finding of fact as to "accommodation" on the theory that such a finding is in the nature of conclusion of law. *Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir. 1976). We disagree.

Other circuit courts that have been confronted with this question have concluded that this is basically a question of fact and not one of law. *Chrysler Corp. v. Mann*, 561 F.2d at 1286; *United States v. City of Albuquerque*, 545 F.2d at 111; *Williams v. Southern U. Gas Co.*, 529 F.2d at 488.

The term "reasonable accommodation" is a relative term and cannot be given a hard and fast meaning. Each case involving such a determination necessarily depends upon its own facts and circumstances, and comes down to a determination of "reasonableness" under the unique circumstances of the individual employer-employee relation-

---

**13.** We believe that what the court in *Chrysler* was suggesting was that when "procedures and scheduling already provide a measure of elasticity in switching work shifts and in allowing excused absences," a plaintiff's failure to first seek an accommodation within these procedures indicates a lack of cooperation which, when combined with other factors, may render an accommodation impossible.

But see *Jordan v. North Carolina National Bank*, 565 F.2d 72 (4th Cir. 1977). The court there found that a prospective employee's refusal to agree to ever work on her Sabbath was "so unlimited and absolute in scope . . . that it speaks its own unreasonableness and thus beyond accommodation."

**14.** See n. 6, *supra*.

ship. The trier of fact is in the best position to weigh these considerations.

We conclude that the trial court's determination of the issue of "accommodation" must be accepted unless it is "clearly erroneous," i. e., if after a careful review of the record the reviewing court is left with the definite and firm conviction that the finding is clearly wrong and that a mistake has been made. *Chrysler, supra,* at 1286.

### C.

When the defendant learned of the conflict between Redmond's religious obligations and the Saturday overtime schedule (which clearly occurred at the August 2 meeting), GAF had an obligation to reasonably accommodate the practice unless it could demonstrate that the accommodation would impose an undue hardship on the conduct of its business. 42 U.S.C. § 2000e(j).

The trial court below found that defendant made "no effort to accommodate plaintiff," and that it had "introduced no evidence showing or tending to show any inconvenience" justifying its failure to accommodate plaintiff. Unless we are convinced that these findings are "clearly erroneous" the judgment of the district court must be upheld. We find no such mistake, having examined the record carefully and in detail.

The record shows that despite the knowledge of Redmond's obligation, his employer indicated to him that he would have to work on Saturday "or else." Mr. Redmond responded that if it was between his religion or his job, he would have to follow the dictates of his religion, whatever the result. Mr. Redmond was terminated the same day. We note that there was no discussion during this meeting of an alternative way of solving the problem other than Mr. Redmond agreeing to work on Saturday. There was no discussion of excusing him, even though apparently this had been done in the past. There was no discussion of the possibility of transferring him to another of GAF's warehouses or transferring him to another job to eliminate this conflict. The only alternative given to Redmond was to agree to work on Saturday or lose his job.[15] GAF made "no effort to accommodate" Redmond.

The court's finding that there was no evidence showing any "inconvenience" to justify GAF's failure to accommodate plaintiff, we do not find to be clearly erroneous.[16]

While the court did not have the benefit of the clarification which the Supreme Court recently gave to "accommodation" and "undue hardship" in *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) there is no showing that the standard used here diverges from that enunciated by the *Hardison* Court. But *cf. Ward v. Allegheny,* 560 F.2d 579 (3rd Cir. 1977). The record contains evidence relevant to the interpretation given to the term "undue hardship" by *Hardison* and supports the finding of the court below.

The record reveals that defendant would not have had to underman its warehouse operation if plaintiff were excused from work. There were six other warehouses in the Chicago area from which it could draw. There was also testimony that on other occasions when overtime was required in the warehouse, the company had either hired temporary help or had used office help. Furthermore, Saturday overtime was not done regularly, so the problem was not

---

**15.** We also note that the record does not reveal that there were any existing procedures whereby Redmond would on his own have been able to accommodate his practices, such as switching schedules or finding a substitute, as there was in *Chrysler, supra.* Apparently all the warehouse employees were required to work overtime. The only exception to this was the warehouse supervisor, Hampton. He was in addition to being a supervisor, and therefore not paid extra for overtime work, a Seventh Day Adventist. The company never scheduled him for Saturday work.

**16.** We interpret the finding of "no inconvenience" to be the equivalent of finding "no undue hardship." To the extent these terms may differ in meaning, defendant benefited since "inconvenience" would be a lower standard than "undue hardship."

a constant one (Redmond worked on Saturday only five times during 1973).

There is no showing that a replacement would result in a loss of efficiency. The testimony was uncontradicted that the work done on Saturday in overtime was essentially unskilled work that any employee would be capable of doing.

To pay replacement employees premium wages would not impose a cost on the defendant, for the regular warehouse employees were already receiving premium wages for their Saturday work.

There was no union or collective bargaining contract which would present any problem in shifting plaintiff's schedule.

Therefore, we agree with the trial court's finding that defendant made no effort to accommodate plaintiff's religious needs, and failed to demonstrate that it would suffer any undue hardship in accommodating the plaintiff.[17]

For the foregoing reasons, we affirm the judgment of the trial court.

AFFIRMED.

---

**17.** Defendant also challenges the constitutionality of Title VII as it relates to religion arguing it is violative of the establishment clause. However, defendant did not raise the issue below and federal courts have traditionally held that constitutional arguments cannot be raised for the first time on appeal. *Allen v. Beneficial Finance Co.,* 531 F.2d 797, 805 (7th Cir. 1976).