**John M. BUSHOUSE, Plaintiff,**

v.

**LOCAL UNION 2209, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al., Defendants.**

**No. 1:00 CV 0339.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Oct. 2, 2001.

Anthony Stites, Barrett and McNagny, Fort Wayne, IN.

Michael J. Cork, Burton & Cork, Indianapolis, IN, for John M. Mushouse.

Barry A. Macey, Macey, Macey and Swanson, Indianapolis, IN, M. Jay Whitman, UAW Regional Office, Detroit, MI, for Local 2209.

Theodore C. Hirt, John R. Griffiths, U.S. Dept. of Justice, Civil Div., Washington, DC, for U.S.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This cause is before the court for resolution of cross-motions for summary judgment filed by the Plaintiff, John Bushouse ("Bushouse" or "Plaintiff") and Defendants Local Union 2209, United Automobile, Aerospace & Agricultural Implement Workers of America, et al. ("the Union") on May 15, 2001. The parties concluded briefing on these motions on July 9, 2001, making these motions ripe for consideration. On August 15, 2001, the court held a telephonic hearing regarding the pending motions. Thereafter, the court held an additional hearing on September 13, 2001 in which it further discussed the legal issues presented in this case. After consideration of the briefs presented by the parties and the arguments made during both hearings, the Defendants' motion for summary judgment will be GRANTED. The Plaintiff's motion will be DENIED.

### APPLICABLE STANDARD

This Court has oft-repeated the standards governing summary judgment, *see*

*Steele v. City of Bluffton*, 31 F.Supp.2d 1084, 1087–88 (N.D.Ind.1998), and need not enlarge this decision further by reiterating them here. Nevertheless, the traditional notions previously set forth by this Court apply equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir.1996). Thus, when cross-motions for summary judgment are filed, the "[c]ourt must take a dual perspective: [e]ach movant has the burden of establishing the absence of any genuine issue of material fact on its own motion." *ITT Industrial Credit Co. v. D.S. America, Inc.*, 674 F.Supp. 1330, 1331 (N.D.Ill.1987). Cognizant of these standards and recognizing that summary judgment is only appropriate by the very terms of Rule 56(c) where there exists "no genuine issue as to any material facts and ... the moving party is entitled to judgment as a matter of law," the Court now turns to the factual and legal arguments advanced regarding the pending motions for summary judgment.

## FACTUAL BACKGROUND[1]

Bushouse is employed at the General Motors ("GM") plant in Fort Wayne, Indiana and has been employed by GM since 1978.[2] As an employee of GM, Bushouse is a member of the collective bargaining unit represented by the International Union, UAW, and its Local 2209.

From 1978 until 1999, Bushouse was a full dues paying member of the Union. During this time Bushouse voiced no religious objection to paying dues to the Union although he states that his membership in the Union bothered his conscience and became increasingly difficult to reconcile with his evolving religious beliefs.

In the late fall of 1998, Bushouse read a *USA Today* article about a Supreme Court decision involving unions. Thereafter, Bushouse contacted the National Right to Work Legal Defense Foundation ("the Foundation"), an organization named in the newspaper article Bushouse read,[3] and asked if it was true that he did not have to be a member of the union. The Foundation informed Bushouse by letter that he had a right to cancel his union dues and included forms which Bushouse could use to resign from the Union. Thereafter, Bushouse submitted a resignation request to the Union and served notice that he was canceling his union dues. The Union processed Bushouse's resignation and cancellation of dues and began treating him as a non-member *Beck* objector.[4] As a *Beck* objector, the Union required Bushouse to pay the percentage of dues that is expend-

---

1. The factual recitation contained herein contains the undisputed material facts adapted from the Statements of Material Facts submitted by the parties as part of their motions for summary judgment.

2. Bushouse worked in General Motors plants in Three Rivers and Kalamazoo, Michigan in addition to the Fort Wayne plant.

3. The Foundation's official website, *www.nrtw.org.*, describes the organization as "[a] non-profit organization providing free legal aid nationwide to thousands of employees whose human and civil rights have been violated by compulsory unionism abuses."

4. In *Communications Workers of America v. Beck*, 487 U.S. 735, 744, 108 S.Ct. 2641, 101

L.Ed.2d 634 (1988), the Court held that § 8(a)(3) of the NLRA does not require employees who object to funding union's nonrepresentational activities, "to support union activities beyond those germane to collective bargaining, contract administration and grievance adjustment." The Court concluded that § 8(a)(3) only authorizes a union to exact those dues "necessary to performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." Id. at 762–63, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (citation and internal quotations omitted). Consequently, employees "may request that their dues and fees be reduced by the percentage of funds allocated by the union to nonrepresentational activities," *Thomas v. NLRB,*

ed by the Union on matters related to collective bargaining, contract administration and grievance handling but not the percentage of dues related to other Union activities such as political activity.

In the late summer of 1999, Bushouse received additional information from the Foundation indicating that the law permits an individual who holds sincere religious beliefs that preclude him from membership in a union or from financially supporting a union to pay the equivalent of dues to a charity rather than to the Union ("the Charity Option"). In September 1999, Bushouse requested the Union to treat him as a religious objector and grant him the Charity Option. In his statement to the Union, Bushouse stated, "[m]y religious organizational membership, convictions, beliefs and teachings are contrary to the UAW's laws, rules and everyday reality. Reverend Leonard Greenway of the Third Christian Reformed Church, Kalamazoo, MI, instilled a Biblical teaching and theology of the Holy Scriptures. He implored members of the Church not to join any clubs, organizations, or unions."[5] At the end of his statement, Bushouse listed the Foundation as the first charity to which he sought to donate the equivalent of his dues.[6]

The Union requires any individual seeking the Charity Option to provide independent corroboration of the individual's claim that he or she sincerely holds a religious conviction that precludes him or her from membership in or financial support of a union. The Union requires such corroboration to separate those individuals who have ideological or political reasons for seeking the charity exception from an individual who has religious reasons for doing so.

Prior to Bushouse's request, most of the employees who sought the Charity Option were members of particular organized religions such as the World Wide Church of God or Jehovah's Witnesses, that have, as a religious belief, a prohibition on their members belonging to certain types of organizations, including labor unions. In these situations, the Union asked the employee to submit an Application that identified the religious body or sect to which he or she belonged and requested that the member complete a "Religious Body or Sect Certificate" ("Certificate") signed by a pastor or church elder attesting that fact. Both of these requirements track language in § 19 of the National Labor Relations Act ("NLRA")[7] and requested that the employee establish that he or she

213 F.3d 651, 654 (D.C.Cir.2000), including such activities as lobbying and political campaigning. *Id.* Employees who request such a reduction in union fees are known as "Beck objectors." *Id.*

5. The parties provide a detailed exposition of Bushouse's religious convictions from birth to the present. These facts are intended to demonstrate, depending upon which party interprets them, that Bushouse either does or does not hold sincere religious beliefs that prevent his membership in unions. Given the court's resolution of this case, these facts are not contained herein.

6. The parties informed the court at the second hearing that the collective bargaining agreement approves three charities for Bushouse to

pay his dues in lieu of the Union. Although it is unclear it appears that these charities are the other three that Bushouse listed on this form—the Mental Health Association in Allen County, the American Red Cross Disaster Relief fund, and the United Way.

7. NLRA Section 19 provides "An employee who is a member of and adheres to established and traditional tenets or teachings of a bona fide religion, body, or sect which has historically held conscientious objections to joining or financially supporting labor organizations shall not be required to join or financially support any labor organization as a condition of employment; except that such employee may be required in a contract .... in lieu of periodic dues and initiation fees, to pay sums equal to such dues and initiation

belonged to a religion, body or sect that has historically held conscientious objections to joining or financially supporting labor organizations.

Bushouse's request was routed to Stan Geis ("Geis"), Administrative Assistant to the Secretary Treasurer of the International Union, who responded to Bushouse's request by letter. Geis' response letter included the standard Application and Certificate forms traditionally sent to religious objectors. In turn, Bushouse responded by letter in which he included the Application. In the space on the Application to identify a religious body or sect, Bushouse wrote "Religion: Protestant." Bushouse further indicated on the space asking for a date when he or she joined this religious sect as follows: "Born again Christian: March 1973." Bushouse objected to the Certificate claiming that NLRA § 19 was "invalid" [8] and that he should be entitled to religious objector status pursuant to Title VII of the Civil Rights Act of 1964 without the submission of a certificate signed by a Pastor or Church Elder.

When Geis received Bushouse's letter and objection, he amended the Application and Certificate to specifically reference Title VII and added a paragraph in the Certificate which states: "In place of this form, the International Union will accept a credible independent corroboration that establishes that you hold sincere religious beliefs that preclude you from financially contributing to labor organizations." (Defendants' Statement, p. 9, fn. 3). Geis then advised Bushouse via letter that the Union was not insisting that Bushouse comply with § 19 and that it was flexible regarding the evidence an employee could submit to establish his entitlement to the Charity Option.[9]

Geis testified that Bushouse's request was the first request he had ever received specifically referencing Title VII. When asked about the concept of "independent corroboration" and what Geis interpreted that phrase to mean, Geis testified as follows:

Q. So you are requesting as independent corroboration from Mr. Bushouse effectively a statement from someone who holds a religious position within a religious organization, is that fair?

A. That is fair. I would have to look at what he furnishes or produces. I don't think that would be fair to say a person absolutely has to be an elder, or priest, or a pastor in a church.

Geis Dep. p. 77.

In December 1999, Bushouse filed a Charge of Discrimination with the EEOC claiming religious discrimination. In proceedings before the EEOC, Bushouse argued that the Union was unlawfully refusing to grant his request for the Charity Option because he did not meet the § 19 requirement that he be a member of a religious body that historically objected to Unions. In response, the Union, through Thomas Mutchler, the Assistant Director of the Union's National Civil Rights Department, wrote the following letter, dated March 23, 2000, to Bushouse:

You misunderstand, or intentionally misrepresent the [Union's] position. The

---

fees to a nonreligious, nonlabor organization charitable fund ..." 29 U.S.C. § 169.

**8.** At least one court has concluded that the requirement under § 19 that an individual have church membership to qualify for the charity option is unconstitutional. *See Wilson v. NLRB*, 920 F.2d 1282, 1287 (6th Cir.1990).

**9.** Geis further suggested that a statement from Greenway would be sufficient for the Union to permit him to receive the Charity Option. However, Geis later became aware that Bushouse could not submit a statement from Greenway because Greenway died in 1985.

[Union] is not requiring a particular "certificate." Nor does it insist on a particular form of theological pronouncement, capable of being issued from this or that ecclesiastical structure.

As Stan Geis said in his November 19, 1999, letter to you, the [Union] only wants some 'independent corroboration' that you hold sincere religious beliefs, which preclude you from financially supporting the [Union] with union security payments. The [Union] does not insist that it come from a particular individual(s). The key here is that it comes from some reliable person other than you. This certainly should not be a burden of any sort.

Your March 16 letter demonstrates that, so far, you cannot offer a single person who can, or will, corroborate your claim to these beliefs. You insist that, based only on your assertion, you are entitled to be treated differently. This is not sensible, nor is it the law ...

(Defendant's Statement, p. 10). According to Mutchler, the Union believed that Bushouse's motivation for seeking the Charity Option was political rather than religious. The Union based this belief on the fact that Bushouse utilized information and forms prepared by the Foundation in submitting his request for religious accommodation. In addition, Bushouse improperly designated the Foundation as the charity to which he intended to donate the equivalent of his dues.[10]

In late May or early June 2000, Bushouse submitted two identically worded documents entitled "Independant [sic] Corroboration" to Geis. Each document was signed by Bushouse and another individual. The portion of the form signed by Bushouse stated:

I, John M. Bushouse, have sincere religious beliefs, which preclude me from joining and financially supporting labor organizations. My Protestant beliefs, based on the Holy Bible that are in conflict with the UAW are; pledging allegiance to the UAW, truth, work, and strikes. This paper is not a particular certificate. This paper is certainly not a burden of any sort.

[Dated:] May 24, 2000/s/ John M. Bushouse

The lower portion of the form contained the following certification:

By signing this paper, the undersigned, is neither [sic] endorsing or rejecting John Bushouses' belief. Rather he/she is merely acting as a reliable person to what John has said are his sincere beliefs.

This certification was signed by Daniel Rodriguez and a woman named Brenda (her last name is illegible).[11]

After receiving and reviewing these statements, Geis concluded that they did not meet the Union's request for independent corroboration because neither individual signing the certification attested that they had any personal knowledge that Bushouse in fact held sincere religious beliefs that prevented him from participating in a Union. Rather, according to Geis, the certifications were hearsay statements that Bushouse told them that he has sincere religious beliefs.

10. Bushouse also implied in his objection to the original forms sent to him by Geis that he would utilize the Foundation for legal action against the Union. Bushouse wrote, "[s]hould you need clarification in a judicial setting, I think that you can guess which one of the three charitable funds that I have listed, [sic] will be the one that I will contact."

11. Bushouse also claims that he requested independent corroboration from Monsignor Lester of the Immaculate Conception Catholic Church, Vicki Tacket, a counselor at the Salvation Army; Bob Chapman, a chaplain at General Motors Fort Wayne Assembly; and a neighbor, Kay Anna Mackenzie, but all of these individuals declined to help him.

Thereafter, in August 2000, Bushouse filed the instant lawsuit claiming violations of Title VII and that 29 U.S.C. § 169 (§ 19 of the NLRA) was unconstitutional. Subsequently, on March 26, 2001 Bushouse provided to the Union an Affidavit of Rick Hawks who identified himself as the Pastor of The Chapel, a non-denominational church in Fort Wayne. In his affidavit, Hawks averred that although The Chapel "has not historically held conscientious objections to joining or financially supporting labor organizations," Bushouse's beliefs that he should not support or join a union are "based in his interpretation of scripture, specifically the Bible." (Hawks Aff. ¶¶ 5, 10). In addition, Hawks stated, "I am able to certify that I know John Bushouse personally and that he holds sincere religious beliefs that preclude him from joining or financially supporting labor organizations." (Hawks Aff. ¶ 11). Based upon this affidavit, Geis concluded that Bushouse had provided appropriate independent corroboration that his beliefs are sincere and religious. Accordingly, Bushouse qualified for the Charity Option and has been provided that option since April 2001.

In his present lawsuit, Bushouse has conceded his claim that § 19 of the NLRA is unconstitutional and focuses on the contention that the Union violated Title VII by refusing to accommodate his religious

beliefs between September 1999 and April 2001.

With these facts in mind, the court turns now to a discussion of the core issues presented in this case.

### DISCUSSION

■ Title VII of the 1964 Civil Rights Act requires employers to make reasonable accommodations for their employees' religious beliefs and practices, unless doing so would result in "undue hardship" to the employer. 42 U.S.C. §§ 2000e–2(a)(1),[12] 2000e(j) [13] (1982). On its face Title VII's religious accommodation provision applies to employers only. However, the duty to accommodate an employee's religious beliefs extends to unions as well as employers. See *Tooley v. Martin–Marietta Corp.*, 648 F.2d 1239, 1241 (9th Cir.), cert. denied, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981). Where a collective bargaining agreement includes a union security provision, as is the case here, the duty to accommodate is satisfied by allowing an employee to donate an amount equal to union dues to a charity. *See id.* at 1242; see also *McDaniel v. Essex Int'l, Inc.*, 696 F.2d 34, 36 (6th Cir.1982). This substituted charity accommodation lets the union enjoy the benefits of a union security provision while permitting employees "to practice in accordance with their religious convictions." *Tooley*, 648 F.2d at 1242.[14]

---

**12.** It is an unlawful employment practice to "discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of . . . religion." 42 U.S.C. § 2000e–2(a)(1) (1982).

**13.** "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j) (1982).

**14.** Although it is clear that Bushouse's claim is based upon Title VII, he makes repeated reference to NLRA § 19. Section 19 of the NLRA also permits unions to provide a substituted charity accommodation. However, "[t]he protections afforded employees' religious beliefs are not as broad under section 19 as they are under section 701(j)." *International Ass'n of Machinists v. Boeing Co.*, 833 F.2d 165, 169 (9th Cir.1987), "[U]nder section 19 only employees who are members of 'bona fide' religions which have 'historically held conscientious objections' to joining unions may contribute to charities in lieu of paying their dues to the union." *Id.* In contrast, Title

■ Bushouse argues that the Union violated Title VII through its request that he produce "independent corroboration" that his beliefs are sincerely held and religious. In particular, Bushouse makes two claims. First, he claims that the entire concept of "independent corroboration" violates Title VII because an employer is not entitled to inquire into the sincerity or religious nature of his beliefs. Second, Bushouse claims that the "independent corroboration" requested by the Union here was an attempt by the Union to require him to be a member of an official religion that holds objections to funding unions before it would accommodate his religious beliefs.

■■ For Bushouse to establish a prima facie case of religious discrimination under Title VII, he must show that: (1) he holds a sincere religious belief that conflicts with a union requirement; (2) he informed the union of the conflict; and (3) adverse action was taken for failing to comply with the conflicting requirement, in this case, the failure of the union to make a religious accommodation. See *Protos v. Volkswagen of Am., Inc.,* 797 F.2d 129, 133–34 (3d Cir.1986) (citations omitted). If the union member establishes a prima facie case, the burden shifts to the union to show that it made good faith efforts to accommodate, or that the requested accommodation would work an undue hardship. *E.E.O.C. v. United Parcel Service,* 94 F.3d 314, 318 (7th Cir.1996) ("The employer may respond to the prima facie case either by proving that it was unable to provide a reasonable accommodation without undue hardship or that it offered a reasonable accommodation which was not accepted by the employee."); see also

*Beasley v. Health Care Serv. Corp.,* 940 F.2d 1085, 1088 (7th Cir.1991); *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1512 (9th Cir.1989); *Jenkins v. Louisiana,* 874 F.2d 992, 995 (5th Cir.1989); *Protos v. Volkswagen of America, Inc.,* 797 F.2d 129, 133 (3d Cir.1986).

The crucial question presented by the facts in this case focuses on the first step of the prima facie case, i.e., did Bushouse demonstrate at the time of his request for accommodation that he had sincere religious beliefs that conflict with the Union's requirement that he pay dues. More specifically, the question raised is whether a union has a right to inquire into the sincerity of a member's claim that he holds religious beliefs that foreclose him from paying union dues when the Union has reason to believe that the request is either insincere, political, or a personal preference rather than a religious belief. Bushouse claims that any inquiry violates Title VII and that this is particularly true in the case of the Union's requirement of "independent corroboration." In response, the Union urges that Bushouse has the burden of establishing both the sincerity and the religious nature of his beliefs before any obligation to accommodate his religious beliefs arises. The Union also argues the flip-side—that it is affirmatively entitled to inquire into the sincerity of Bushouse's belief to determine whether he falls within the protected class of Title VII thereby obligating the union to accommodate his beliefs. Finally, the Union argues that the concept of "independent corroboration" is a simple and unintrusive means of inquiring into the sincerity of an individual's purported beliefs.

VII protects "all aspects of religious observance and practice, as well as belief" regardless of membership in a religion, body or sect. 42 U.S.C. § 2000e(j). Thus, under Title VII, "[a]n employee who has sincerely held reli-

gious beliefs opposing unions could be relieved from paying dues under Title VII, even if he or she was not a member of an organized religious group that opposes unions." *Boeing,* 833 F.2d at 169.

The parties agree that these issues are novel ones and matters of first impression for this court to decide. The Supreme Court's opinions in two cases provide some insight into the questions presented here. See *United States v. Seeger*, 380 U.S. 163, 184, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *Wisconsin v. Yoder*, 406 U.S. 205, 215–216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In *Seeger*, the Supreme Court addressed the permissible scope of governmental and court inquiries into the religious beliefs held by conscientious objectors to service in the United States military, stating:

> The validity of what [a registrant] believes cannot be questioned. Some theologians, and indeed some examiners, might be tempted to question the existence of the registrant's 'Supreme Being' or the truth of his concepts. But these are inquiries foreclosed to Government. As Mr. Justice Douglas stated in *United States v. Ballard*, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944): 'Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others.' Local boards and courts in this sense are not free to reject beliefs because they consider them 'incomprehensible.' Their task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious.

*United States v. Seeger*, 380 U.S. 163, 184, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). In *Wisconsin v. Yoder*, 406 U.S. 205, 215–216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), a case involving members of the Old Order Amish religion and the Conservative Amish Mennonite Church who were convicted of violating Wisconsin's compulsory school attendance law by declining to send their children to public or private school after they had graduated from the eighth grade,

the Supreme Court reiterated that claims rooted in religious belief must be treated "delicately" but permitted some inquiry into the religious nature of the belief:

> ... [T]o have the protection of the Religion Clauses, the claims must be rooted in religious belief. Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis.

*Id.* see also, *Thomas v. Review Bd. of Indiana Employment Sec. Division*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task ...").

In the context of religious discrimination claims, courts have likewise been reluctant to scrutinize an individual's religious beliefs and have not required that the beliefs in question be based upon organized or recognized teachings of a particular sect. See *EEOC v. Allendale Nursing Centre*, 996 F.Supp. 712, 714–715 (W.D.Mich.1998) (citing cases). While Title VII's provisions define what constitutes a "religious belief" broadly to include 'all aspects of religious observance and practice, as well as belief,' it is clear that the employee's belief must be religiously motivated in the plaintiff's own scheme of things and it must be a sincere belief. See *Anderson v. USF Logistics*, 2001 WL

114270 (S.D.Ind.2001) (citing *Redmond v. GAF Corporation,* 574 F.2d 897, 900 (7th Cir.1978)). Moreover, in line with the broad definition of "religious belief" in Title VII, the Seventh Circuit has admonished courts to refrain from determining what is and what is not a religious practice in a way similar to the Supreme Court's admonition in *Seeger:*

> First, we note that the very words of the statute ("all aspects of religious observance and practice . . .") leave little room for . . . a limited interpretation. Secondly, we note that to restrict the act to those practices which are mandated or prohibited by a tenet of the religion, would involve the court in determining not only what are the tenets of a particular religion, which by itself perhaps would not be beyond the province of the court, but would frequently require the courts to decide whether a particular practice is or is not required by the tenets of the religion. We find such a judicial determination to be irreconcilable with the warning issued by the Supreme Court in Fowler v. Rhode Island, 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953), '[I]t is no business of courts to say . . . what is a religious practice or activity . . .'

*Redmond v. GAF Corporation,* 574 F.2d 897, 900 (7th Cir.1978). The Seventh Circuit further set forth the test to be applied in religious accommodation cases: "We believe the proper test to be applied to the determination of what is 'religious' under § 2000e(j) can be derived from the Supreme Court decisions in *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), and *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1969), i.e., (1) is the 'belief' for which protection is sought 'religious' in person's own scheme of things, and (2) is it 'sincerely held.' " *Redmond,* 574 F.2d at 901 n. 12.

What we learn from *Redmond,* illuminated by the Supreme Court's reluctance to interpret the validity of religious beliefs in *Seeger* and *Yoder,* is that government should use caution before subjecting an individual's religious convictions to a "truth test." Nonetheless, at least in some contexts, as was the case in *Seeger,* it is appropriate to examine or inquire into the sincerity of an individual's belief and whether the belief is, in fact religious, before permitting special accommodation to be made based upon that belief. *See Seeger,* 380 U.S. at 185, 85 S.Ct. 850 ("the threshold question of sincerity . . . must be resolved in every case."). This holds true in the instant case. Given the purpose of the protections and special accommodations afforded by Title VII, the court concludes that Title VII does permit an inquiry into the sincerity and religious nature of an employee or member's purported beliefs before the duty to accommodate such a belief arises, as further explained below.

Title VII requires the Union to accommodate only those members who hold sincere religious beliefs that specifically conflict with a union requirement. Absent any right of inquiry, a union's hands would be tied so that any member's self-serving statement that he had sincere religious beliefs that conflict with a job requirement would have to be accommodated unless such accommodation posed an undue hardship to the union. Bushouse argues that the Union in this case should simply have accommodated him because to do so did was no undue burden on the Union and his request was easily accommodated. Indeed, the Union concedes that the accommodation requested, paying dues to a charity, does not create an undue hardship to the union and the record clearly demonstrates that the Union accommodated Bushouse immediately upon receiving the affidavit from Pastor Hawks attesting that he knew Bushouse and that his beliefs were

both sincere and based upon religious scripture. Yet Bushouse's argument that he should just have been accommodated would eliminate a key requirement under Title VII. Under Title VII, the burden falls on Bushouse to show that he holds a sincere religious belief that conflicts with a union requirement. *See EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir.1997) ("if the religious beliefs that apparently prompted a request are not sincerely held, there has been no showing of a religious observance or practice that conflicts with an employment requirement.").

Bushouse also argues that he met his burden by merely telling the Union that he held sincere religious beliefs that conflicted with the requirement that he pay dues to a union. Certainly, Bushouse initiated the process of requesting religious accommodation by informing the Union of his religious beliefs and that they conflicted with paying union dues. The Union, however, refused to accommodate Bushouse because it questioned whether his beliefs were truly held and religious rather than political. At this point, this court believes the burden remained with Bushouse to submit some evidence, aside from his general assertions, to support his contention that he sincerely held religious beliefs that conflicted with his union obligation to pay dues. In an attempt to resolve this issue and accommodate Bushouse, the Union asked him to provide acceptable "indepen-

dent corroboration" that his beliefs were truly held. Bushouse did not do so, in the Union's estimation, until it received the affidavit from Pastor Hawks. Under these circumstances, this court cannot find fault with the Union especially since Bushouse made no offer of any proof to them in any other form to establish the sincerity and religious nature of his beliefs.

As was the case with the draft board in *Seeger*, this court concludes that the Union did not violate Title VII by making some inquiry into the facts and circumstances of Bushouse's claim that his beliefs were religious and that they were sincerely held. Certainly, the Union's right of inquiry is a limited one for as *Seeger* and *Redmond* make clear, it is not the union's right to determine what is or is not a valid religious belief or practice. The union was only permitted to satisfy itself that the member is "sincere" and that the belief is "religious" under the broad definition of that term as provided in Title VII and no more.[15]

In reaching this conclusion; the court acknowledges that there may be cases that arise where a union member provides all that the Union requests and the Union remains steadfast in its refusal to accommodate the member's belief because it believes it is either not sincere or not religious. An employer/union taking this position may very well subject themselves

---

15. This court's conclusion is bolstered by the broad definition of "religious belief" contained in Title VII which extends Title VII's protections beyond the observances and practices of formal religion. Certainly, Title VII's intention is to provide protection and accommodation for a broad spectrum of religious practices and belief not merely those beliefs based upon organized or recognized teachings of a particular sect. *See Allendale Nursing Centre*, 996 F.Supp. at 714–715 (citing cases). However, it is equally clear that Title VII was only intended to protect and accommodate individuals with "sincere" religious beliefs and not those with political or other beliefs unrelated to religion. Admittedly, religious accommodation cases differ from the typical Title VII case because employers are not able to readily discern an employee's membership in a protected class as they may be able to in race and gender discrimination claims. Thus, a limited inquiry into the sincerity of a union member's claimed religious beliefs allows the union to ascertain whether an individual is motivated by sincere religious convictions as opposed to political or other convictions which might be used by a member to avoid a particular union requirement.

to the pains of litigation. However, whether Title VII is violated in these types of cases will necessarily be decided based upon the facts specific to those claims. With this said, the court turns to the specific facts of this case to determine whether the Union's requirement of "independent corroboration" violates Title VII.

The Union presented a form to Bushouse which stated ". . . the International Union will accept a credible independent corroboration that establishe[s] that you hold sincere religious beliefs that precludes you from financially contributing to labor organizations." The Union asserts, and the documentary evidence supports its contention, that this certification was not required to be in any particular form or from any particular person, nor did it require membership in any particular church or religious organization. Geis testified that while a statement from someone in a religious position would certainly have been acceptable to the Union there was no requirement that the certification be from "an elder, or priest, or pastor in a church." *Geis Dep.* p. 77. In addition, Mutchler's March 2000 letter to Bushouse responding to Bushouse's EEOC charge of discrimination reiterated this point "[t]he UAW does not insist that [the independent corroboration] come from a particular individual(s). The key here is that it comes from some reliable person other than you." This letter suggests that the Union was flexible, as Geis wrote in his initial letter to Bushouse, and that it was not requiring the certification to take any particular form or be issued from any particular person.

This requirement of independent corroboration created by the Union is neither imposing or onerous. It simply requires a statement from a third person affirming personal knowledge of the union member's sincerity in the religious beliefs he professes to have. Nevertheless, Bushouse objects to the concept of "independent corroboration" as applied to him claiming that it is a well-disguised attempt by the Union to require his membership in a religious body or church or to require a statement from a religious person.[16] Bushouse further claims that in some cases it may be impossible for an individual to produce a statement from a third person attesting to the sincerity of another's religious beliefs.[17]

In support of his claim that the requirement for "independent corroboration" violates Title VII as applied to him, Bushouse points to the fact that the Union refused to accept the first two certifications he submitted. Bushouse claims that the Union rejected these certifications because they were not from religious people. Yet, while Bushouse makes this assertion, the Union's rationale for rejecting these certifications—that the certifications did not really "certify" anything because the individuals making the certification lacked personal knowledge of Bushouse's beliefs—has gone unchallenged in the record. There is simply no evidence supporting Bushouse's assertion that the Union rejected these certifications because they were not from specific religious people.

Bushouse also contends that because the Union did accept the affidavit from Pastor Hawks, it is clear that the Union was requiring the certification to be from a

---

16. The Union did state during one of the hearings that it is helpful to have a person trained in theology assess the sincerity and religious nature of an individual's purported belief. However, there is no evidence that the Union required Bushouse to submit a statement from such a person.

17. Plaintiffs argue, for instance, that an individual who attends church by watching television evangelists may have a difficult time finding someone to provide independent corroboration.

religious person in an organized religion. Again, this is complete supposition on Bushouse's part. The Union officials testified that Hawks' Affidavit was accepted because he stated that he had personal knowledge of Bushouse's beliefs and that they were both sincere and based in scripture. There is nothing in the record that even suggests that the Union's explanation is fabricated and that the true reason they accepted Hawks' Affidavit was because he is a pastor of an organized religion. Thus, the court concludes that no genuine issue of fact exists on the issue of whether "independent corroboration" as applied in this case violates Title VII.[18]

In sum, the court concludes that Title VII does not prohibit the union from making an inquiry into the sincerity of its member's claim that he or she holds sincere religious beliefs that preclude him or her from funding or participating in a union. Further, the Union's requirement of independent corroboration as applied in this case did not violate Title VII.

### CONCLUSION

Based on the foregoing, Bushouse's Motion for Summary Judgment is DENIED; the Union's Motion for Summary Judgment is GRANTED.

---

**18.** By sanctioning the concept of "independent corroboration" as applied to the facts of this case, the court is not suggesting that the Union may not be flexible in the manner in which it chooses to inquire into the sincerity of a member's belief when it has reason to question that sincerity. The inquiry and the scope of that inquiry will necessarily vary based upon the individual requesting corroboration and the facts and circumstances of that request. This court concludes only that under the facts and circumstances of the present case, the inquiry by the Union did not violate Title VII.