**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SHERRY H. DETWILER, | No. 23-3710 |
| *Plaintiff - Appellant*, | D.C. No. 3:22-cv-01306-JR |
| v. | District of Oregon, Portland |
| MID-COLUMBIA MEDICAL CENTER; CHERI MCCALL, an individual; DOES, 1 through 50, | |
| | ORDER |
| *Defendants - Appellees*. | |

Filed April 15, 2026

Before: John B. Owens and Lawrence VanDyke, Circuit Judges, and Richard Seeborg, Chief District Judge.[*]

Order;
Dissent by Judge Forrest;
Dissent by Judge Tung

---

[*] The Honorable Richard Seeborg, United States Chief District Judge for the Northern District of California, sitting by designation.

**SUMMARY**[*]

**Employment Discrimination / Religious
Accommodation**

The panel denied a petition for panel rehearing and a petition for rehearing en banc in a case in which the panel majority affirmed the district court's dismissal of a Title VII action alleging discrimination on the basis of religion by plaintiff's employer in connection with a COVID-19 vaccine requirement.

In its opinion, the panel majority held that the plaintiff failed sufficiently to plead a bona fide religious belief that conflicted with her employer's policy requiring healthcare workers to be vaccinated against COVID-19, absent an approved exception, and she therefore failed to state a failure-to-accommodate claim.

Dissenting from the denial of rehearing en banc, Judge Forrest, joined by Judges R. Nelson, Bress, Bumatay, VanDyke, and Tung, wrote that, in an effort to prevent religion from being used as an insincere excuse for avoiding general public-health measures implemented to address the COVID-19 pandemic, the court held that plaintiffs claiming religious discrimination must show a clear nexus between their religious convictions and their choice not to comply with those measures that does not involve "secular" knowledge. The court also held that in establishing such nexus, plaintiffs may not rely on the invocation of prayer, without more. But this standard necessarily requires judging

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

religious belief, and it is a significant misstep that risks reducing the freedom of belief to the freedom of accepted belief.

Dissenting from the denial of rehearing en banc, Judge Tung, joined by Judges R. Nelson, Collins, Lee, Bress, Bumatay, and VanDyke, wrote that the panel majority legally erred by recharacterizing the plaintiff's clearly religious objection to a company policy as "purely secular" merely because the objection turned in part on a secular consideration.

**ORDER**

Judges Owens and Seeborg have voted to deny the petition for panel rehearing. Judge Owens has voted to deny the petition for rehearing en banc, and Judge Seeborg so recommends. Judge VanDyke has voted to grant the petition for panel rehearing and rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 40.

The petition for panel rehearing and the petition for rehearing en banc are denied.

Judge Forrest's and Judge Tung's dissents from the denial of rehearing en banc are filed concurrently herewith.

FORREST, Circuit Judge, joined by R. NELSON, BRESS, BUMATAY, VANDYKE, and TUNG, Circuit Judges, dissenting from the denial of rehearing en banc:

Religion claims can be vexing for judges. Where an individual's belief is at issue, we must set aside many of our usual skills and tools. We are generally called upon to interpret and apply text using reason and logic. And reason and logic suggest these competencies are as effective in assessing religion as law. After all, religion is, in the eyes of some, just a collection of principles or beliefs around which people order their lives—like law. And morality infuses both realms. But for over 150 years, it has been black-letter law that judges lack competence in matters of religion. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 729, 20 L.Ed. 666 (1871).

Why? The answer is two-fold. First, we don't necessarily know anything about the spiritual or divine. These aren't required subjects in our curriculum. Second, our constitutional order preserves the right of each individual to live according to their own conscience. Thus, while courts usually test the veracity and reasonableness of parties' assertions, this exercise largely yields in matters of belief. As the Supreme Court put it: "It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith . . . as the ablest men . . . are in reference to their own." *Id.* This is not an easy ask, and we judges don't always recognize the limits of our competence.

This case is an example. In an effort to prevent religion from being used as an insincere excuse for avoiding general public-health measures implemented to address the COVID-19 pandemic, the court held that plaintiffs claiming religious

discrimination must show a clear nexus between their religious convictions and their choice not to comply with those measures that does not involve "secular" knowledge. The court also held that in establishing such nexus, plaintiffs may not rely on the "[i]nvocation of prayer, without more." *Detwiler v. Mid-Columbia Med. Ctr.*, 156 F.4th 886, 897 (9th Cir. 2025). This standard necessarily requires judging religious belief, and it is a significant misstep that risks reducing the freedom of belief to the freedom of accepted belief, which is not freedom at all.

## JUDGING RELIGIOUS BELIEF

This case is presented under Title VII of the Civil Rights Act of 1964. Title VII prohibits employers from "discharg[ing] any individual, or otherwise [] discriminat[ing] against any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie case of religious discrimination, a plaintiff must demonstrate "that (1) he had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer threatened him with or subjected him to discriminatory treatment, including discharge, because of his inability to fulfill the job requirement[]." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993).

Congress defined "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j); *see EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771–72 (2015). Implementing that broad definition, the Equal Employment Opportunity Commission's regulations explain that "[i]n most cases, whether or not a practice or belief is religious is not at issue."

29 C.F.R. § 1605.1 (2024). But when the nature of belief is at issue, "religious practices . . . include moral or ethical beliefs" that parallel traditional religious views. *Id.*; *see United States v. Seeger*, 380 U.S. 163, 176 (1965); *Welsh v. United States*, 398 U.S. 333, 339 (1970).

Our role in assessing whether a plaintiff has shown a bona fide religious belief is a "narrow function." *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014)). Generally, we may determine only whether the religious conflict identified by the plaintiff "reflects an honest conviction." *Id.* (quoting *Burwell*, 573 U.S. at 725). This is because anything more extends beyond a judge's competence.[1] Accordingly, the list of questions that we may not undertake in this context is long and well-established.

First, we may not evaluate the veracity of religious belief. *See United States v. Ballard*, 322 U.S. 78, 86–87 (1944); *Callahan v. Woods*, 658 F.2d 679, 685 (9th Cir. 1981). Individuals "may believe what they cannot prove," and "[t]hey may not be put to the proof of their religious doctrines or beliefs." *Ballard*, 322 U.S. at 86. "The law knows no heresy." *Id.* (quoting *Watson*, 80 U.S. at 728).

Second, we may not assess the reasonableness of religious belief. *See Bolden-Hardge*, 63 F.4th at 1223. "[R]eligious beliefs need not be acceptable, logical,

---

[1] The Supreme Court has confirmed that First Amendment limitations apply in the employment context, acknowledging that the Religion Clauses in the Constitution set a ceiling on judicial inquiry. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 184–90 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746–47 (2020).

consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). The law accepts that "[r]eligious experiences which are as real as life to some may be incomprehensible to others." *Ballard*, 322 U.S. at 86.

Third, we may not judge the orthodoxy of religious belief or practice. *See Thomas*, 450 U.S. at 716; *Heller*, 8 F.3d at 1438. It is not within our competence to define a religion's tenets. *See Thomas*, 450 U.S. at 716 ("Courts are not arbiters of scriptural interpretation."); *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969) ("[T]he First Amendment forbids civil courts from" interpreting "particular church doctrines and the importance of those doctrines to the religion."); *Heller*, 8 F.3d at 1438. Nor may we decree whether a particular practice or observance is required by a religion's tenets. *See Thomas*, 450 U.S. at 716 ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner . . . correctly perceived [his faith's] commands."); *Heller*, 8 F.3d at 1438. To warrant protection, beliefs "need not be confined in either source or content to traditional or parochial concepts of religion." *Welsh*, 398 U.S. at 339.

Fourth, and relatedly, we may not impose orthodoxy. That is, we may not protect only those formally mandated religious practices or observances. *Heller*, 8 F.3d at 1438 (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 900 (7th Cir. 1978)); *see Fowler v. Rhode Island*, 345 U.S. 67, 69–70 (1953). Or only those tied to scripture or other religious authority. *See Thomas*, 450 U.S. at 715; *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1155–56 (9th Cir. 2025); *Callahan*, 658 F.2d at 686 ("[N]either widespread adherence nor scriptural support is a prerequisite to

constitutionally protected status for a purportedly religious claim."). Such would offend freedom of conscience twice over by discriminating against ways of forming belief and imposing an artificial hierarchy of protection. *See Heller*, 8 F.3d at 1438. A person of faith is not obligated to think or act perfectly in line with her claimed orthodoxy to obtain legal shelter. *See Thomas*, 450 U.S. at 715–16 ("[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect."); *Damiano*, 140 F.4th at 1155–56; 29 C.F.R. § 1605.1 ("The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief.").

Fifth, we may not opine on what beliefs or practices are truly religious. *See Fowler*, 345 U.S. at 70 ("[I]t is no business of courts to say . . . what is a religious practice or activity."). "[T]he very words of [Title VII] ('*all aspects* of religious observance and practice . . . .') leave little room" for an interpretation that would restrict religious protections to those practices found to be sufficiently religious by a judicial authority. *Heller*, 8 F.3d at 1438 (first alteration in original) (quoting *Redmond*, 574 F.2d at 900). And by what measure would a court make this judgment anyway? "Some theologians . . . might be tempted to question the existence of the [individual]'s 'Supreme Being' or the truth of his concepts. But these are inquiries foreclosed to Government." *Seeger*, 380 U.S. at 184. It is enough that a belief or practice is religious in the individual's "own scheme of things."[2] *Id.*

---

[2] *Wisconsin v. Yoder*, 406 U.S. 205 (1972), is often cited for the principle that courts may investigate whether a belief is religious or secular. *See, e.g.*, *Detwiler*, 156 F.4th at 894; *Malik v. Brown*, 16 F.3d 330, 333 (9th

at 185; *Callahan*, 658 F.2d at 683 (explaining that the test for whether a belief is religious (not secular) under *Seeger* is "whether beliefs professed are sincerely held and, in claimant's scheme of things, religious").

Sixth, we may not dissect a believer's articulation of her religious belief. *Thomas*, 450 U.S. at 715. Those beliefs communicated with precision are no more deserving of protection than those held by an unwavering believer who struggles to articulate her beliefs. *See id.*; *Seeger*, 380 U.S. at 174 ("[I]n no field of human endeavor has the tool of language proved so inadequate in the communication of ideas as it has in dealing with the fundamental questions of man's predicament in life, in death[,] or in final judgment and retribution.").

Seventh, we may not tease apart an individual's reasons for adopting a religious practice so long as they are at least partially motivated by religious conviction. *See Callahan*, 658 F.2d at 687 ("So long as one's faith is religiously based at the time it is asserted, it should not matter, for constitutional purposes, whether that faith derived from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible."). A believer may have overlapping spiritual and secular motivations. *See id.* "A secular experience can stimulate a spiritual response; lives are not so compartmentalized that one can readily keep

---

Cir. 1994). But *Yoder* did not overrule *Fowler* or *Seeger*. The religious character of the Amish's objection to the compulsory schooling at issue in *Yoder* was not challenged. 406 U.S. at 219. And in discussing the religious character of Amish belief, the Court did not identify what standard it was applying other than to say that the issue was "delicate" and that an objection to generally applicable law "based purely on secular considerations" is not protected by the Religion Clauses. *Id.* at 215.

the two separate." *Id.* Such coexistence is not inconsistent with religious motivation. *See id.* And in any event, courts are not well equipped to "distinguish between beliefs springing from religious and secular origin." *Id.*

In the end, in matters of religious belief, the proper judicial inquiry is limited to assessing the believer's sincerity. *Seeger*, 380 U.S. at 184–85; *Thomas*, 450 U.S. at 715–16. Both that the individual conceives her belief to be religious as broadly defined and that the asserted belief "is 'truly held.'" *Seeger*, 380 U.S. at 185.

## BACKGROUND

This case was terminated on a motion to dismiss. Meaning, all we have to consider are Detwiler's complaint and attached documents, which we must accept as true and construe in her favor. *See Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020) (as amended).

Detwiler alleges that she is "a practicing Christian" and "believes her body is a 'temple of the Holy Spirit.'" She believes it is her "duty to avoid defiling her 'temple' by taking in substances that the Bible explicitly condemns or which could potentially cause physical harm to her body."

Approximately six months after the COVID-19 pandemic started, Detwiler was hired as a data-privacy executive by Mid-Columbia Medical Center (MCMC). Her job did not require contact with patients. She could, and at times did, perform her responsibilities remotely, and MCMC issued her equipment and a virtual private network to facilitate remote work.

Nearly a year after Detwiler was hired, the Oregon Health Authority implemented a vaccine mandate for healthcare workers that permitted religious exemptions.

"After much prayer and consideration," Detwiler applied for an exemption because she learned that the available vaccines were made using cells from aborted fetuses and "contained neurotoxins, attenuated viruses, carcinogens . . . , chemical wastes, and other potentially harmful substances." In her exemption request, she stated:

> I have asked God for direction regarding the current COVID shot requirement. As I have prayed about what I should do, the Holy Spirit has moved on my heart and conscience that I must not accept the COVID shot. If I were to go against the moving of the Holy Spirit, I would be sinning and jeopardizing my relationship with God and violating my conscience.

MCMC approved Detwiler's requested exemption—with conditions—without questioning the religious nature or sincerity of her beliefs. The conditions that MCMC imposed were that Detwiler wear personal protective equipment when in the office and "submit to weekly antigen testing."

The only testing option that MCMC offered Detwiler involved inserting into her nose "a cotton swab dipped in ethylene oxide." Detwiler also requested a religious exemption from this testing requirement. This time, she explained:

> I pray and ask God for wisdom and direction daily. As part of my prayers, I have asked God for direction regarding the current COVID testing requirement. As I have prayed about what I should do, the Holy

> Spirit has moved on my heart and conscience
> that I must not participate in COVID testing
> that causes harm.

She then described her conclusion that the nasal testing was harmful, referencing the U.S. Environmental Protection Agency's finding that ethylene oxide is "carcinogenic to humans" and the National Institute of Health's finding that "[r]esidual levels of [ethylene oxide] recovered from cotton swabs have adverse effects on DNA profiles." She also presented evidence from her healthcare provider that nasal testing would exacerbate her existing medical conditions. She invoked a right to refuse the testing because to submit would "be in direct conflict with [her] Christian duty to protect [her] body as the temple of the Holy Spirit." As an alternative solution, Detwiler offered to submit to weekly saliva testing or to work fully remote while the vaccine/testing requirement was in effect. MCMC refused Detwiler's proposed alternatives and ultimately terminated her.

Detwiler sued for religious discrimination in employment under Title VII and Oregon law. The district court dismissed the case on the pleadings, concluding that Detwiler had not plausibly alleged the first element of the prima facie case: that she has a "bona fide religious belief, the practice of which conflict[ed] with an employment duty." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). The district court reasoned that Detwiler refused the testing "based on her personal preferences" because her belief that it was harmful was not premised "on the Bible or any other religious tenet or teaching, but rather on her research-based scientific/medical judgments."

The same theme animated this court's decision. While the panel acknowledged that beliefs can derive from a combination of spiritual and secular considerations and are "presumably protected" when they do, *Detwiler*, 156 F.4th at 894 (quoting *Callahan*, 658 F.2d at 684), it held that a plaintiff seeking a religious exemption "must connect the requested exemption with a truly religious principle," *id.* at 895. "Invocations of broad, religious tenets cannot, on their own, convert a secular preference into a religious conviction." *Id.* Recognizing that courts may not "examine . . . the reasonableness of a belief," *id.* at 894, the panel suggested that the necessary inquiry is limited to determining whether the "plaintiff has pled enough facts to show her belief *is* religious, rather than purely secular," *id.* at 895 (emphasis added).

Applying its new specification of the prima facie standard, the panel accused Detwiler of "obfuscat[ing] [her] belief at issue." *Id.* In its judgment, the relevant belief was not that her body is a temple, but that ethylene oxide nasal testing is dangerous, a point based entirely on Detwiler's understanding of secular information. *Id.* That is, the panel concluded that Detwiler did not have relevant overlapping religious and secular beliefs, only a secular belief. *Id.* The panel reasoned that the religious principles that Detwiler asserted were too broad and too tenuous from her actual motivation. It then went a step further and held that "prayer, without more, is [] insufficient to elevate personal medical judgments to the level of religious significance." *Id.* at 897.

## ANALYSIS

There are multiple problems with the panel's decision. I agree with Judge VanDyke and Judge Tung that the effort to have courts divide religious and secular motivations is not

workable doctrinally or practically. I also agree that the court's new, more restrictive approach conflicts with the text of Title VII as well as constitutional principles. I focus primarily on a different problem—the court's rejection of individual communion with God as a basis for establishing bona fide religious belief.[3]

The court's concern about Detwiler's assertion of belief being "too broad" or "too tenuous" and its rejection of prayer as a sufficient explanation for a believer's actions is clear evidence of its inability to evaluate religious belief.[4] Belief in prayer and the ability to seek and obtain direction from a higher power is firmly rooted in many religious traditions. *See Ballard*, 322 U.S. at 87 ("[T]he power of prayer [is] deep in the religious convictions of many."). This belief has existed across time, geography, and culture, from prophets Abraham and Muhammad to figures Joan of Arc and

---

[3] My discussion focuses on the Judeo-Christian tradition of communion with God because that is Detwiler's tradition. But other religions believe in communication with a higher power in various forms, and I do not understand the strictures imposed by the court's decision in this case to apply only to Christians.

[4] The court began its rule crafting by recognizing that we have "not yet endorsed a test for determining the nature, whether religious or secular, of a belief underlying a Title VII claim." *Detwiler*, 156 F.4th at 892. That is true. But the rule for determining whether a belief is religious in the First Amendment context has long existed. *See Seeger*, 380 U.S. at 176; *United States v. Ward*, 989 F.2d 1015, 1017–18 (9th Cir. 1992). And we frequently look to First Amendment principles to inform the corollary Title VII analysis. *See, e.g.*, *Damiano*, 140 F.4th at 1155–56; *Bolden-Hardge*, 63 F.4th at 1223; *Spencer v. World Vision, Inc.*, 633 F.3d 723, 728–29 (9th Cir. 2011) (per curiam) (O'Scannlain, J., concurring); *Elvig v. Calvin Presbyterian Ch.*, 375 F.3d 951, 955–56 (9th Cir. 2004); *Heller*, 8 F.3d at 1438; *Hudson v. Western Airlines, Inc.*, 851 F.2d 261, 265 (9th Cir. 1988); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1370 (9th Cir. 1986). The panel was wrong not to do so here.

Desmond Tutu. And it is a fundamental feature of Christianity.

Detwiler informed MCMC: "I pray and ask God for wisdom and direction daily," and "the Holy Spirit has moved on my heart and conscience that I must not participate in COVID testing that causes harm." The court accuses Detwiler of "obfuscat[ing] [her] belief at issue." *Detwiler*, 156 F.4th at 895. As the court sees it, the relevant belief is Detwiler's narrow proposition "that the testing swab is harmful," which the court concludes she came to based solely on secular information. *Id.* And in the court's judgment, Detwiler's concern about the nasal antigen test was "far too attenuated" from her religious beliefs about her body. *Id.*

This is seriously reductive. The court's reasoning gives no credence to Detwiler's claim that she received revelation from God that informed her health choices. For those who believe that God can provide individualized guidance for daily living, whether that guidance relates to "secular" or "spiritual" matters is often a distinction without a difference—both emanate from beliefs about deity and its relationship with humanity. That is, many believers do not perceive that the spiritual and the secular are capable of neat separation as relates to matters of revelation.

A few examples to illustrate the point. The New Testament teaches Christians that "[i]f any of you lack wisdom, let him ask of God, that giveth to all men liberally." *James* 1:5 (King James). There is no indication that God provides only spiritual wisdom. John Calvin described his view of God's influence on man this way: "that God . . . inclines and moves the wills of men even in external things, and that their choice is not so free, but that its liberty is

subject to the will of God. That your mind depends more on the influence of God, than on the liberty of your own choice." John Calvin, 1 *Institutes of the Christian Religion* 283 (John Allen trans., 6th ed. 1921). And Thomas Aquinas believed that divine revelation and human reason work in concert. *See, e.g.*, St. Thomas Aquinas, 1 *The* Summa Theologica *of Saint Thomas Aquinas* 2–3 (Fathers Eng. Dominican Province trans., 2d ed. 1920). These are matters on which there are divergent doctrines and opinions. The point is, imposing a concrete correlation between the immediate source of information and the source of motivation for action, as the court did here, misapprehends many beliefs and believers.

If there was an obfuscation of belief, it was the court's doing. Reading Detwiler's allegations in their entirety and in the light most favorable to her, the through line is both her conviction that God gives her direction and her commitment to follow that direction. That the revelation she claims to have received concerning the COVID nasal testing required her to employ a measure of her own reason or judgment, rather than simply follow a conclusive directive, does not categorically strip her conduct of religious significance. This is evidenced by her statement: "If I were to go against the moving of the Holy Spirit, I would be sinning and jeopardizing my relationship with God and violating my conscience." This belief may be foreign or irrational to some, but that does not change that many fervently believe in the possibility of a divine response to their private petitions, regardless of the underlying subject matter. *Cf. Ballard*, 322 U.S. at 87. Such beliefs deserve deference the same as any other sincere religious conviction. *Thomas*, 450 U.S. at 714. And accepting Detwiler's allegations as true, as the court was obligated to do, there is no way to parse the

religious and the secular without violating this principle and impermissibly opining on the veracity of her beliefs. *See Ballard*, 322 U.S. at 86–87.

In justifying its sidelining of prayer as a basis for establishing bona fide belief, the court suggests that Detwiler made only "minimal reference to prayer." *Detwiler*, 156 F.4th at 897. This is facially false and demonstrates that the court did not read Detwiler's allegations in her favor. Likewise, the court's demand for more specificity concerning Detwiler's religious beliefs and motivations is contrary to Supreme Court guidance. *See Thomas*, 450 U.S. at 716 ("Courts should not undertake to dissect religious beliefs because the . . . beliefs are not articulated with the clarity and precision that a more sophisticated person might employ."). The court's characterization of Detwiler's beliefs shows that, intentionally or not, it was making a qualitative judgment, not a descriptive one.

As has been pointed out by the other dissenters, the precedent on which the court relies is assailable. First, the court points to a series of Third Circuit decisions. Citing *Africa v. Pennsylvania*, 662 F.2d 1025, 1030–31 (3d Cir. 1981), and *Fallon v. Mercy Catholic Medical Center*, 877 F.3d 487, 490–91 (3d Cir. 2017), the court credits the Third Circuit as having "regularly declined to accept assertions of religious belief wholesale." *Detwiler*, 156 F.4th at 898. But neither of these decisions applies here. The test recognized in *Africa* and applied in *Fallon* answers "whether a particular set of ideas constitutes a religion." *Africa*, 662 F.2d at 1031; *see Fallon*, 877 F.3d at 491. The court here acknowledges that question "is not at issue"—there is no dispute that Detwiler's beliefs about God and the sacredness of her body are religious. *Detwiler*, 156 F.4th at 898 n.4. And describing the Third Circuit's decisions as cautioning against allowing

"plaintiffs to anoint their claims with a divine mandate" is inaccurate and risks conflating whether a belief is religious with whether it is legitimate. *Id.* at 897.

The court also discusses a recent unpublished Third Circuit decision, *Gatto v. Johnson & Johnson Services, Inc.*, No. 24-1992, 2025 WL 816732 (3d Cir. Apr. 21, 2025). *Id.* at 898. There, as here, an employer adopted a COVID-19 nasal-testing requirement, and the employee sought a religious exemption, asserting the testing violated her Christian beliefs because she is obligated to protect her body and the testing "require[d] the insertion of foreign matter into her body." *Gatto*, 2025 WL 816732, at *1. The Third Circuit stated that the relevant question was "whether [the employee]'s objections to nasal testing [we]re best classified as either personal, secular, or medical as opposed to religious." *Id.* at *2.

This qualitative framing and subsequent analysis are as replete with statutory and constitutional problems as the court's opinion here. Even if *Gatto*'s analysis were persuasive as to religiosity, this decision stands in alarming contrast to the broader pattern among the circuit courts respecting claims based on personal revelation. *See, e.g.*, *Thornton v. Ipsen Biopharmaceuticals, Inc.*, 126 F.4th 76, 82 (1st Cir. 2025) (recognizing a practitioner's belief that she can receive messages from God through prayer and the Holy Spirit); *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 471 (4th Cir. 2025) (recognizing a Christian's belief that she can receive personal instruction and direction from God through prayer and personal study); *Sturgill v. Am. Red Cross*, 114 F.4th 803, 808 (6th Cir. 2024) (recognizing a Christian's belief that she can receive guidance from God about daily decisions through prayer and personal study); *Lucky v. Landmark Med.*, 103 F.4th 1241, 1243 (6th Cir.

2024) (recognizing a Christian's belief that she can receive personal direction from God through prayer); *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1007, 1009 (7th Cir. 2024) (recognizing a Christian's belief that God will impart wisdom and discernment through prayer and the Holy Spirit); *Bube v. Aspirus Hosp., Inc.*, 108 F.4th 1017, 1019–20 (7th Cir. 2024) (recognizing a Catholic's belief that she must follow her conscience as informed by God's intent for her).

The court also placed significant weight on numerous district court decisions, which it concluded had "more relevance" than First Amendment precedent. *Detwiler*, 156 F.4th at 896. Its discussion of these authorities suggests that a uniform view has emerged. *See id.* at 896–97. This is incorrect. For example, one learned district judge has noted that it "is a fool's errand" to parse the religious and secular aspects of a person's request for a religious exemption because "[i]t puts courts right in the middle of a fundamentally religious process." *Routsalainen v. Legacy Health*, No. 3:24-cv-01042-MO, 2025 WL 1135233, at *4 (D. Or. Apr. 17, 2025). Specifically addressing the view that general religious belief is attenuated from particular action, *Routsalainen* explained:

> This ignores what is really going on here, which is a believer struggling with how to live out her beliefs in her daily life. Maybe figuring out what a broad commandment requires of her will involve certain "factual" assertions; maybe she will even get some of those wrong. Or maybe she will be wrong on the factual assertions but still have the settled feeling that this is what God requires of her.

> However you slice it, this methodology enmeshes the courts into the heart of the life of a believer. And in the end, it does so insultingly, by telling a believer that her rationale for [her action] isn't really religious at all, but merely secular.

*Id.* In any event, even if there were a uniform view in the lower courts, that could not displace applicable doctrine established by the Supreme Court and this court. Stare decisis means little if a panel of this court can sidestep jurisprudential constraints by searching for validation in sources beyond those that properly govern its analysis.

To be clear, I do not dismiss the court's concern about allowing religion to become "a blanket privilege and a limitless excuse for avoiding all unwanted obligations." *Detwiler*, 156 F.4th at 897 (quoting *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 465 (M.D. Pa. 2022)). Nor do I dispute that the robust protections we afford religious beliefs can be misused to assert counterfeit excuses. But how we address this problem matters, and the court's chosen path is contrary to law and first principles. Policing whether a stated belief is "truly religious" in the name of staving off a "blanket privilege" will inevitably lead to policing belief itself. While courts need not accept "conclusory assertions of violations of their religious beliefs at face value," the proper inquiry cannot be as searching as the court suggests, particularly at the pleading stage. *Bolden-Hardge*, 63 F.4th at 1223; *see Thomas*, 450 U.S. at 714–16.

Employing the First Amendment's more deferential standard for identifying a bona fide religious belief in the Title VII context does not contravene the ability to root out meritless or abusive claims. An allegation may be facially

implausible. *See Thomas*, 450 U.S. at 715 ("One can . . . imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as to not be entitled to protection."). An alleged belief can be proven insincere as a matter of evidence. *E.g.*, *Moore v. Effectual Inc.*, No. 3:23-cv-05210-DGE, 2024 WL 1091689, at *9–10 (W.D. Wash. Mar. 13, 2024). And employers have the opportunity to demonstrate that yielding to an individual employee's religious practice will impose an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *e.g.*, *Peterson*, 358 F.3d at 606–09. Given the light touch government must take regarding religion, these are the proper mechanisms for addressing the court's concerns, not terminating more cases on the pleadings based on qualitative judgments about belief.

## CONCLUSION

The Supreme Court has been clear: courts are unwelcome guests in matters of belief. Judges know law, not liturgy. Thus, when a case challenges our views of permissible belief, we must not succumb to the temptation to opine. The court failed to hold that line here, setting us on a course that inevitably runs headlong into any one of a variety of statutory problems and constitutional violations. We err by not correcting this misstep. For that reason, I respectfully dissent from the denial of rehearing en banc.

TUNG, Circuit Judge, joined by R. NELSON, COLLINS, LEE, BRESS, BUMATAY, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

Title VII protects an employee from religious discrimination. In denying an employee's claim of discrimination here, the panel majority recharacterized the employee's clearly *religious* objection to a company policy as "*purely secular*" merely because the objection turned in part on a secular consideration. That was legal error. The panel majority's approach disregards the definition of "religion" under Title VII and misconstrues the employee's well-articulated allegations. Its approach splits with several other circuits, too, as the panel majority admits. Respectfully, I dissent from this court's refusal to grant en banc review.

*         *         *

This case asks whether an employee adequately pleaded a bona fide religious belief that conflicted with company policy. Sherry Detwiler alleged that she was a practicing Christian who believed her body to be a temple of the Holy Spirit, and that complying with company policy—which required her to submit to weekly antigen testing for COVID-19—would contravene that belief. The testing would, according to Detwiler, put her in direct contact with a carcinogen that could alter her DNA, and would thus violate her religion's proscription against defiling her body. Under Title VII, she alleged, the company had to accommodate her so long as such accommodation would not impose undue hardship on the company.

The district court dismissed Detwiler's complaint with prejudice, and the panel majority affirmed, over Judge

VanDyke's dissent.  Detwiler's belief, the panel majority held, was not "religious" at all and was thus entitled to no protection under Title VII.  Rather, in its view, Detwiler's notion of "harm"—"specifically that [the chemical used on the testing swab] is a carcinogen"—was a purely "personal and secular" belief, "premised on her interpretation of medical research." *Detwiler v. Mid-Columbia Med. Ctr.*, 156 F.4th 886, 895 (9th Cir. 2025); *see also id.* (stating that Detwiler failed to plead "enough facts to show her belief is religious, rather than purely secular").  "Without Detwiler's opinion that [the chemical] is carcinogenic and therefore harmful," the panel majority said, "she has no conflict with [the company's] COVID-19 testing requirement—her secular judgment offers the sole basis of her objection." *Id.* The panel majority concluded that "[t]his concern about the harmful nature of [the chemical] has no relationship with her religious beliefs." *Id.*

The panel majority is wrong.  Detwiler properly alleged the religious basis of her objection to testing—namely, that her religion forbade her from ingesting a carcinogen, which she viewed as a defilement upon the temple of her body. That her objection was based in part on a medical finding— that the testing is carcinogenic—did not negate her religious motivation in refusing to submit to such testing.

One can readily acknowledge facts of life that may carry no religious significance on their own—the prevalence of the poor, the suffering of the sick, the chemical makeup of certain substances.  But religion tells an adherent *what to do* about those facts.  For many Christians (and those of other faiths), their religion enjoins them to tend to the poor and the sick, not simply to recognize their existence.  For Detwiler, her request for accommodation was based not on the mere fact that she risked exposure to a carcinogen; after all, others

complied with company policy despite that risk. What set her apart was her religion. For Detwiler, her religion dictated what she should do: refuse testing out of respect for God's law as she saw it rather than go along with company policy.

The panel majority thus grossly mischaracterized Detwiler's objection as "*purely* secular" when it rejected her complaint on that basis. *See id.* (emphasis added). In reaching that flawed conclusion, the panel majority misapplied Title VII's text and precedent interpreting "religion," misconstrued Detwiler's allegations, and split with the holdings of several other circuits (as the panel majority itself conceded). But perhaps most problematic, the panel majority's approach would recast as "purely secular" a person's religious practices whenever those practices turn also on secular considerations. It is hard to imagine, frankly, what religious practice would *not* turn on secular considerations to some degree. And so, just like that, with the wave of a gavel, a wide swath of religious beliefs or practices (no matter how sincerely alleged) might now be deemed purely secular and removed from Title VII's protections. This court should have corrected these defects en banc.

## I.

Title VII bars an employer from discriminating against an employee because of the employee's "religion." 42 U.S.C. § 2000e-2(a)(1). It also requires the employer to accommodate an employee's religious belief "unless doing so would impose an undue hardship." *Bolden-Hardge v. Off. of California State Controller*, 63 F.4th 1215, 1222 (9th Cir. 2023) (citing 42 U.S.C. § 2000e(j)). The term "religion," as defined in the statute, "includes *all* aspects of religious

observance and practice, as well as belief[.]"   42 U.S.C. § 2000e(j) (emphasis added).   For a plaintiff employee to survive a motion to dismiss, she must at the very least plead that she "had a bona fide religious belief, the practice of which conflicted with an employment duty."  *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993); *Bolden-Hardge*, 63 F.4th at 1222.

Detwiler cleared that hurdle here.  According to her complaint, she was an employee of Mid-Columbia Medical Center and was fired from her job in late 2021 "for refusing, on religious grounds, to receive a COVID-19 vaccine or, in the alternative, submit to weekly nasal swab tests to determine whether she had been infected with COVID-19." ER 73.   Although the Medical Center granted her an exemption from the vaccine mandate, it still required her to submit to weekly testing.  ER 77–78, 96.

Detwiler objected to that testing on religious grounds. Invoking Corinthians, she alleged she was "a practicing Christian who believes her body is a 'temple of the Holy Spirit[.]'"  ER 76, 98.  In accordance with that scriptural injunction, she alleged, "Plaintiff sincerely believes she has a religious duty to avoid defiling her 'temple' by taking in substances that the Bible explicitly condemns or which could potentially cause physical harm to her body."  ER 76–77.

The weekly antigen testing, she alleged, would result in bodily defilement and thus compromise her religious beliefs. Pursuant to this test, a person administering it would "press" a "cotton swab dipped in ethylene oxide ('EtO')" "against the skin inside [the person's] nostrils multiple times, swirl the swab around in a circular motion to collect mucus from the person's nasal tissues, then submit the swab to a lab for testing."   ER 78.   Detwiler learned information "from

multiple sources indicating that EtO is a carcinogenic substance." ER 78. And "[n]ot wanting to take EtO into her body and run the risk of suffering from cancer, Plaintiff [] invoked her Christian beliefs concerning her body being a temple of God[.]" ER 78. Detwiler stated that she "prayed about" what to do and that "the Holy Spirit ha[d] moved on [her] heart and conscience that [she] must not participate in COVID testing that causes harm." ER 98. Detwiler said that "[i]f [she] were to go against the moving of the Holy Spirit, [she] would be sinning and jeopardizing [her] relationship with God and violating [her] conscience." ER 98.

Detwiler acknowledged that she relied on her scientific judgment in determining that the testing exposed her to a carcinogen. But as she explained, her decision in refusing to submit to testing was grounded in religious belief, not just empirical fact. Detwiler's religious conviction informed her how *she should act* in the face of potentially ingesting a carcinogenic substance. *See* ER 78 ("While Plaintiff declined to submit to nasal swab testing, at least in part, due to medical and/or scientific judgment, she also exercised religious judgment."); *see also* ER 98 ("As a Christian protecting my body from defilement according to God's law, I invoke my religious right to refuse any testing which would alter my DNA and has been proven to cause cancer. I find testing with carcinogens and chemical waste to be in direct conflict with my Christian duty to protect my body as the temple of the Holy Spirit."). While many might tolerate being exposed to a small amount of a carcinogen to comply with a company requirement, Detwiler could not. Her religion, as she understood it, told her to say "no."

That is more than sufficient to satisfy the "fairly minimal" requirement to plead a bona fide religious belief that conflicts with a company directive. *Bolden-Hardge*, 63

F.4th at 1223.  There is no question here that, as alleged, her religious belief was sincere.  Nor does anyone contend that she was using her religion as mere pretext to get around a company requirement.  She genuinely believed what she said about her religious belief compelling her to refuse any substance that would defile her body—at least we must accept her "allegations as true and view them in the light most favorable to her" at the motion-to-dismiss stage.  *Soo Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations."). And it is equally clear that Detwiler's religious belief compelled her to refuse her company's testing because, in her view, that testing would cause the defilement that her religion forbade.  Accordingly, she has pleaded (specifically and plausibly) a sincere religious belief, "the practice of which conflicted with an employment duty."  *Heller*, 8 F.3d at 1438.

The broad definition of "religion" in the statute reinforces that conclusion.  "Religion" includes "all aspects" of an employee's "religious observance and practice."  42 U.S.C. § 2000e(j); *see also Heller*, 8 F.3d at 1438 ("The very words of the statute . . . leave little room [] for a limited interpretation").  And here, Detwiler's "religious observance and practice" clearly encompassed refusing to take in anything that would defile the body of her temple, including any substance that her medical research concluded was carcinogenic.  To be sure, and again, Detwiler's "religious observance and practice" might be said to have depended in part upon a "secular" assessment of the cancer-inducing effects of the testing.  But that just means her assessment

there formed *an* "aspect" of her "religious observance and practice."

Another aspect of her "religious observance and practice" instructs her to *act* upon that assessment. A "religion" is not merely a matter of the mind; it is "practice[d]" and thus imposes "rules of conduct" about whether and when to act or abstain from an act. Black's Law Dictionary 1455 (4th ed. 1968); *see also* American Heritage Dictionary 1028 (1969) (defining "[p]ractice" as to "carry out in action"). Detwiler's religion compels her to resist ingesting a substance that she believes is a carcinogen. The facts upon which that religious belief operates may be described as "secular"—*e.g.*, the chemical used for COVID testing is carcinogenic. But the refusal to comply is based ultimately on a religious belief.

That "secular" features may interact with "religious" practice in this way does not make the practice any less religious; indeed, courts should "protect[]" that "overlap," just as they have in the free-exercise context. *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981) ("[A] coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one. . . . The devout Seventh-Day Adventist may enjoy his Saturday leisure; the Orthodox Jew or Mohammedan may dislike the taste of pork[.]"). "A secular experience can stimulate a spiritual response," this court has observed; "lives are not so compartmentalized that one can readily keep the two separate." *Id.* at 687. And as another circuit has cogently explained in an analogous case, "the fact that an accommodation request also invokes or, as here, even turns upon secular considerations does not negate its religious nature." *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1008, 1010 (7th Cir. 2024) (holding that the plaintiff employees

sufficiently alleged, under Title VII, that their Christian beliefs—prohibiting defilement of the body as "a temple of the Holy Spirit"—conflicted with their employer's vaccine mandate).  "To conclude otherwise," the court held, "fails to give effect to Congress's expansive definition of 'religion[.]'"  *Id.*

## II.

The panel majority erred in several ways.  *First*, the panel majority disregarded Title VII's definition of "religion."  Indeed, the panel majority offered no analysis of Title VII's text at all.  No surprise then the panel majority failed to recognize that Detwiler's "religious" belief demanded she resist placing carcinogens in her body, and that this belief conflicted with the company's demands.  Contrary to the panel majority, the mere fact that Detwiler thought that the testing swab was carcinogenic does not *alone* explain why Detwiler refused to submit to her company's testing regime.  Rather, it is Detwiler's religion that in the end explains her refusal—clearly an "aspect[]" of her "religious observance and practice."  *See supra* at 26–28.  Had Detwiler harbored a different religion (or no religion at all), she could have decided that the degree of carcinogen ingested was too slight to warrant defying company policy.  But because she viewed her body as a temple of the Holy Spirit, her religion required her to resist *any* defilement.  Mandatory tests thus conflicted with Detwiler's "religious observance and practice," not merely with a "secular" preference.

*Second*, the panel majority disregarded Detwiler's harm as she has alleged it.  According to the panel majority, Detwiler could find the testing "harmful" only in the scientific (non-religious) sense.  *Detwiler*, 156 F.4th at 895.

But by so concluding, the panel majority refused to acknowledge that the "harm" (as alleged by Detwiler) was not only physical but also spiritual—a defilement of the Holy Spirit's temple in the form of her body.  *Contrast id.* (describing as "personal and secular" Detwiler's allegation that ingesting EtO violates her faith), *with, e.g.*, ER 76–77 (describing Detwiler's "religious duty" to avoid ingesting substances "which could potentially cause physical harm to her body"); ER 78 ("Not wanting to take EtO into her body and run the risk of suffering from cancer, Plaintiff [] invoked her Christian beliefs concerning her body being a temple of God.").

Indeed, Detwiler's pleadings inform us that the nature of the harm she would suffer impinged on her conscience and relationship with God.  *E.g.*, ER 98 (alleging that after "pray[ing] about what [she] should do, the Holy Spirit has moved on [her] heart and conscience that [she] must not participate in COVID testing that causes harm," and that "[i]f [she] were to go against the moving of the Holy Spirit, [she] would be sinning and jeopardizing [her] relationship with God and violating [her] conscience").  The harm had, in other words, a supernatural dimension.  But the panel majority ignored that allegation—reducing Detwiler's clearly religious belief to a materialist base, like Cabanis's "secretion of thought by the brain" (Tocqueville, Democracy in America 356 (Bantam 1835)), and erasing, at the motion-to-dismiss stage, a well-pleaded religious element to her harm.

*Third*, the panel majority violated the basic rule that courts must accept a plaintiff's pleadings as true at the motion-to-dismiss stage.  According to the panel majority, Detwiler's objection was "*purely* secular."  *Detwiler*, 156 F.4th at 894 (emphasis added); *id.* at 895 ("her secular

judgment offers the *sole* basis of her objection") (emphasis added).  Detwiler's "concern about the harmful nature of EtO," we are told by the panel majority, "has *no* relationship with her religious beliefs."  *Id.* (emphasis added).  But that plainly contradicts what Detwiler alleged.  Detwiler alleged a "relationship" between the carcinogenic nature of EtO and her religious beliefs.  *See* ER 98 (alleging that if she were to ingest EtO, "[she] would be sinning and jeopardizing [her] relationship with God and violating [her] conscience").  To say that her objection had *nothing* to do with her religious beliefs thus betrays a myopic secularism and badly distorts her pleadings.  At the motion-to-dismiss stage, it is wholly inappropriate for a court to rewrite a plaintiff's allegations or deny the sincerity of a plaintiff's religious beliefs as she has so pleaded them.  *See, e.g.*, *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) (concluding that "it is not within the judicial function and judicial competence to inquire whether" plaintiffs "correctly perceived the commands of their common faith"); *cf. Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) ("How do you [adequately] plead sincerity of belief?  One way is to state that the belief is, in fact, your religious belief.").  Yet the panel majority did just that.[1]

---

[1] The panel majority relies on *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972) for the proposition that courts need not accept what the panel majority describes as "entirely conclusory assertions of religious belief." *Detwiler*, 156 F.4th at 894.  But its reliance is misplaced, as *Yoder* says nothing about pleading requirements.  It involved an appeal from a trial on the merits.  After examining the full factual record from "trial testimony" to "expert witnesses," the Court found sufficient evidence that the plaintiffs believed their objection to compulsory high-school attendance was based on religion.  *Yoder*, 406 U.S. at 207, 209, 219; *see also Watts*, 495 F.3d at 1298 ("*Yoder* did not concern pleading requirements.").  By contrast, the dispute in this case is not over the level

*Fourth*, the panel majority's test of whether an objection is based on "a *truly* religious principle" finds no basis in law or logic. *Detwiler*, 156 F.4th at 895 (emphasis added). It is not for a court to say, at the pleading stage, whether a plaintiff's claim of religious belief is "truly religious."**[2]** *Id.*; *see Bube v. Aspirus Hosp., Inc.*, 108 F.4th 1017, 1020 (7th Cir. 2024) (concluding that "[s]crutinizing" exemption requests—"especially at the pleading stage—runs counter to not only the broad language of Title VII but also the Supreme Court's repeated warnings that the law requires a hands-off approach" to defining religion). The Supreme Court has disclaimed such scrutiny under laws ranging from RLUIPA to conscientious-objector statutes. *See Cutter v. Wilkinson,* 544 U.S. 709, 725 n.13 (2005). But whether religious exemptions arise in those statutes or Title VII, the conclusion is the same: "the 'truth' of a belief is not open to question." *Id.* (citation omitted).

A judge construes law not theology. In a passage free of any citation, the panel majority declared that "[i]nvocations of broad, religious tenets cannot, on their own, convert a secular preference into a religious conviction. To hold otherwise would destroy the pleading standard for religious

---

of evidence needed to ultimately prevail but whether a court may dismiss that claim before such evidence can even be introduced.

[2] Indeed, even the employer in this case—a religious hospital affiliated with the Seventh-Day Adventist Church—agreed with Detwiler that the panel should not have "created a test which would permit it to evaluate whether a belief was 'truly religious.'" Dkt. 99 at 9. As it argued in its response to Detwiler's petition for rehearing en banc, such "[j]udicial inquiry into religious judgments would be harmful to religion and could deeply entangle federal courts in deciding religious questions." *Id.* at 5. The fact that both parties take issue with the panel's reasoning is yet another reason why we should have taken this case en banc.

discrimination claims, allowing complainants to invoke magic words and survive a dismissal without stating a prima facie case." *Detwiler*, 156 F.4th at 895; *see also id.* at 896 ("when the religious principles are *too broad*, and the connection to personal, medical judgments [is] *too tenuous*, plaintiffs have not pled a religious belief" (emphasis added)).

But, again, what place does a judge have, particularly at the motion-to-dismiss stage, to declare that a "religious tenet" is "too broad," or that its "connection" with a medical judgment is "too tenuous" as to render a plaintiff's claim of a sincere religious belief not "*truly*" religious?  Here, Detwiler clearly pleaded a sincere religious belief that required her to refuse testing.  That should be the end of the matter.  Rather than accept the pleadings, however, the panel majority did the opposite, "convert[ing]" Detwiler's "religious conviction" into a "secular preference" to shut down her Title VII claim.  That was wrong.

This court now stands in opposition to several other circuits, as the panel majority itself conceded.  *See Detwiler*, 156 F.4th at 898–99 (describing cases from the Sixth, Seventh, and Eighth circuits as adopting a "far too permissive" standard).  Whereas the panel majority would deem a plaintiff's religious objection "purely secular" where there is an overlap with secular considerations, several other circuits have arrived at the opposite conclusion.  *See, e.g.*, *Passarella*, 108 F.4th at 1010 (concluding that the mere fact that a religious objection "also invokes or, as here, even turns upon secular considerations does not negate its religious nature"); *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 902 (8th Cir. 2024) (holding that plaintiff adequately pleaded a religious conflict with COVID testing where she believed her "body is a temple"); *Lucky v. Landmark Med.*

*of Michigan, P.C.*, 103 F.4th 1241, 1243 (6th Cir. 2024) (holding that plaintiff adequately pleaded a religious conflict where she believed her "body is a temple").

To be sure, the panel majority cited a pair of unpublished Third Circuit cases that have gone its way. *See McDowell v. Bay Health Med. Ctr., Inc.*, No. 24-1157, 2024 WL 4799870 (3d Cir. Nov. 15, 2024); *Gatto v. Johnson & Johnson Servs., Inc.*, No. 24-1992, 2025 WL 816732 (3d Cir. Mar. 14, 2025). But the Third Circuit's reasoning was just as flawed as the panel majority's—neither grappled with the plain text of Title VII, and both misconstrued what plaintiffs claimed their religious beliefs entailed. *See McDowell*, 2024 WL 4799870 at *1 (rejecting plaintiffs' allegation that company policy required them to violate their faith that their bodies are God's temples and "examin[ing] whether [the] belief *is* a religious one" (emphasis added)); *Gatto*, 2025 WL 816732 at *4 (same).

En banc should have been granted to bring our court in line with how every other circuit in precedential opinions has addressed this issue.

*          *          *

What explains the panel majority's extreme distortion of plain statutory text and the party's pleadings?  The panel majority does not hide the ball (to its credit): it fears that allowing a plaintiff's religious claims to survive a motion to dismiss—when there is an overlapping secular basis for objecting to company policy—would "open the door to unlimited religious discrimination claims." *Detwiler*, 156 F.4th at 899; *see also id.* ("Such a deluge would certainly generate negative consequences.").  What the panel majority does in response to that hypothesized fear, however, is to

slide the door shut on well-pleaded claims grounded in sincerely held religious beliefs.

Nor is the assumption of "unlimited" claims true. Not every religious-discrimination claim will prevail: a claim will fail if the religious accommodation to address the discrimination would impose an "undue hardship" on the employer; moreover, any suspicion that religion is being used as a mere pretext to evade a work requirement and that the asserted religious beliefs are not sincerely held could (and should) be tested at summary judgment or trial when evidence is presented. But even assuming some validity to the panel majority's doubtful claim of a "deluge," that is not a problem for the courts to solve. Congress sought to protect religious discrimination claims by defining "religion" broadly in Title VII. If one wished to limit such claims or mitigate the "negative consequences" from that choice, the solution lies with that body.

It is not our role to tell a plaintiff that her sincere religious belief is not "truly religious." Nor can we recast a religious claim as secular just because we think there are or will be too many claims like Detwiler's. Our job here is far more modest: to apply the text as written and to construe a plaintiff's allegations fairly. I dissent.